IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARVIN CHARLES, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UPS NATIONAL LONG TERM | : | No. 12-06223 |
| DISABILITY PLAN, ET AL., | : | |
| Defendants. | : | |

M E M O R A N D U M

Stengel, J.                                                    October 29, 2015

This case stems from Aetna's denial of long-term disability benefits under an ERISA-covered employee benefits plan.[1]  The parties have filed cross motions for summary judgment. For the reasons stated below, I will grant the plaintiff's motion in part and enter judgment in favor of the plaintiff on Count I.

## I.      BACKGROUND

Plaintiff Marvin Charles is a 57-year-old high school graduate.[2] He started working at UPS as a Pre-loader/Porter.[3] He was promoted to the role of package car driver in 1992, making between $50,000-60,000 a year.[4] Prior to working at UPS, Mr. Charles was a dock worker for eight years and a self-employed farm owner for twelve

---

[1] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 1; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 1.

[2] Aetna 23, 27, 30, 368.

[3] Aetna 357.

[4] Aetna 357.

years.[5] As part of his employment with UPS, Mr. Charles participated in the UPS

National Long-term Disability Benefits Plan.[6]

About thirty years ago, Mr. Charles was in a motor vehicle accident causing him

brain trauma.[7] Subsequently, he was diagnosed with partial complex seizure disorder.[8]

The plaintiff took Depakote for several months and then stopped.[9]  He remained seizure-

free for many, many years.[10] In the spring of 2008, he began working with his doctor to

again treat the condition after having a grand mal seizure.[11] His primary care physician

(PCP) referred him for blood tests and an MRI/MRA of the brain.[12] His PCP also told

him to see his neurologist about "initiating medication."[13] His neurologist then prescribed

a medication called lamotrigine, also known as Lamictal, to control his seizures.[14]

---

[5] Aetna 368, 392.

[6] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 2; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 2. See Aetna 747-48, 833.

[7] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 9; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 9. See Aetna 8, 14, 102, 332-33, 335, 435.  While the doctor believed some of his seizures were also related to alcohol use, his recent seizures were non-alcohol related. See Aetna 440, 442, 730.

[8] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 2, 9; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 2, 9. Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 9; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 9. See Aetna 8, 14, 102, 332-33, 335, 435. While the doctor believed some of his seizures were also related to alcohol use, his recent seizures were non-alcohol related. See Aetna 440, 442, 730. See also Aetna 753.

[9] Aetna 442.

[10] Aetna 441.

[11] Aetna 441-42.

[12] Aetna 442.

[13] Aetna 442.

[14] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 10; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 10. The brand name of lamotrigine is Lamictal. The plaintiff's neurologists, Dr. Pacelli and later Dr. Walia, prescribed this medication. Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 10. See Aetna 332-33, 335, 613-17, 624, 628, 631.

Because he was taking anti-seizure medication, the plaintiff could no longer drive a truck for UPS because Department of Transportation regulations prevented him from doing so.[15]

    Mr. Charles stopped working at UPS on June 1, 2009.[16] He applied for short-term disability (STD) benefits, which he began receiving on June 8, 2009.[17] Those benefits, paid through the Central Pennsylvania Teamsters Health and Welfare Fund, expired on February 17, 2010.[18] On May 17, 2010, the plaintiff returned to work at UPS on a part-time basis in a different position.[19] His new position as a pre-loader did not require him to drive. The plaintiff was making $23.75 per hour at that time, working 20 hours a week

---

[15] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 2; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 2; Defendant's Statement of Material Facts at ¶ 17. The Department of Transportation regulations require a driver to be off anti-seizure medication and be seizure-free for two years after ceasing anti-seizure medication. See Aetna 102, 154, 161, 736. While the plaintiff had been seizure-free since December 2008, he continued to remain on seizure medication. Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 9; Defendant's Statement of Material Facts at ¶ 53. See Aetna 102, 332-33, 615-617.

[16] Aetna 7-8, 21, 27, 30.

[17] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 3; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 3. See Aetna 42, 45, 58. Aetna disputes that the plaintiff's receipt of short-term disability benefits is not material. See Defendant's Response to the Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 3. This information is important to give context to the situation.

[18] Aetna 47, 49, 53, 58.

[19] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 7; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 7; Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 34; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 34. See Aetna 83, 305679. Aetna became aware that the plaintiff had returned to work several months after the plaintiff commenced working again. Aetna was informed by the plaintiff's spouse about his return to work on November 23, 2010. Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 7. See Aetna 77. On November 24, 2010, UPS confirmed that the plaintiff had returned to work part time. Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 7. See Aetna 83. On December 14, 2010, Aetna received a completed "other income questionnaire" from the plaintiff showing that he had been working 20 hours a week, 5 days a week. Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 34; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 34. See Aetna 679.

Other notes in the file indicate that the plaintiff started back to work on February 1, 2011. Aetna 178.

over 5 days.[20] He continued to receive STD benefits at a reduced rate while working part-time.

### a. Plaintiff's Initial Disability Determination Under "Own Occupation" Test

The plaintiff then applied for long term disability (LTD) benefits on May 25, 2010.[21] On June 8, 2010, Aetna denied his claim as untimely.[22] The plaintiff appealed the denial on July 2, 2010.[23] On the first level of appeals, the initial decision was originally upheld.[24] At the final level, UPS clarified that the plaintiff, as a union member, had the benefit of an extended period of short-term disability; Aetna recalculated the claim period to be timely.[25]

On November 16, 2010, Aetna authorized the plaintiff to receive LTD benefits effective February 18, 2010 until February 17, 2012.[26] Aetna's reason for its decision was that the plaintiff was still taking Lacmital and was subject to the restrictions of no

---

[20] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 24; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 24. See Aetna 363, 535.

[21] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 4; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 4. See Aetna 27, 356-62.

[22] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 4; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 4; Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 21. See Aetna 27, 33, 38-43, 257, 270-271.

[23] Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 21. See Aetna 58, 73, 258, 270-71.

[24] Aetna 260-62.

[25] Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 21; Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 5; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 5; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 21. See Aetna 34-35, 43, 47, 49, 51, 58, 65, 67, 265, 268-69, 270-271, 338-41, 344, 349-55, 704-23.

[26] Defendant's Statement of Material Facts, Doc. No. 34 at ¶¶ 20, 22; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶¶ 20, 22; Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 5; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 5. See Aetna 58, 73, 270-74.

climbing, driving, or operating machinery by his PCP.[27] The administrative file also notes

that the plaintiff's disability decision was further "supported" by that fact that that he had

returned to work with hourly restrictions.[28] The plaintiff received $2600.00 a month,

which is 60% of his predisability earnings.[29]

In March 2011, Aetna requested updated information from the plaintiff and his

treating medical physicians about his condition.[30] The plaintiff and his physicians

informed Aetna that he continued on his anti-seizure medication as his current treatment

plan and had remained seizure-free.[31] On his claim questionnaire, the plaintiff himself

indicated that he had "trouble staying asleep."[32] He also indicated that he does drive but

only typically drives ten miles daily.[33]

---

[27] Aetna 69, 74. The plaintiff's received primary care medical treatment from Manor Family Health Center. Dr. David Emmert, Dr. Catherine Edmonds, Dr. Peter Altimare, Dr. Robert Baird, and Dr. Richard Gayeski were all associates at Manor with whom the plaintiff dealt. Dr. Walia was the plaintiff's neurologist. See, e.g., Aetna 407, 408, 409, 582, 611.

[28] Aetna 85.

[29] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 22; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 22. See Aetna 273. Aetna claims that this letter explained that the test would change from disability from his "own occupation" to that of "any occupation." However, the letter itself does not say that and instead referred Mr. Charles to see the previous page for the definition of "total disability." This page does not appear to be in the documents submitted in the administrative file. See Aetna 273-74, 272. Information about what this test change involves does not appear in the file until the June 20, 2011 letter to plaintiff about the possible change. Aetna 291, 304. The plaintiff does not raise this as a dispute of material fact.

[30] Aetna 92-98, 102, 328-30.

[31] Aetna 95.

[32] Aetna 398.

[33] Aetna 398.

### b.  Plan Terms Regarding Test Change After Two Years

The terms of the LTD plan dictate that the test for determining whether a participant is disabled changes after two years.[34] A participant's initial determination of disability is based on whether he is disabled from his "own occupation."[35] After receiving benefits for two years, a participant will only continue to receive benefits if he is unable to perform any "reasonable occupation."[36] The plan defines a "reasonable occupation" as "any gainful activity" for which a participant is "or may reasonably become, fitted by education, training, or experience; and [w]hich results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings."[37]

### c.  Plaintiff's Disability Decision under the "Reasonable Occupation" Test

In June 2011, Aetna began reviewing the plaintiff's file to determine if he would continue receiving benefits under the "reasonable occupation" test.[38] Aetna mailed the plaintiff a letter, explaining this change and indicated that it would consider the following information in making its determination: 1) the plaintiff's medical condition and how it may limit his ability to work on a regular basis; 2) the skills and knowledge he has from his education and experience; 3) his prior occupations; 4) and jobs he could perform

---

[34] Aetna 750-51.

[35] Aetna 750.

[36] Aetna 751.

[37] Aetna 766. Aetna calculated the plaintiff's predisability salary as $54,412.80 and found sixty percent of that salary to be $32,647.68, giving the plaintiff an adjusted CPI hourly of $15.89. Aetna 132.

[38] Aetna 113, 291-92.

based on his vocational and physical abilities.[39] The plaintiff was asked to fill out forms which included some of this information.[40]

As part of this review, the plaintiff's PCP submitted an attending physician statement that said the plaintiff could perform "heavy physical demand level work" but must "avoid heights, no driving, climbing or operating heavy machinery."[41] The statement also noted that the plaintiff was still taking Lacmital but noted no adverse effects from the medication.[42] His doctor continued to limit him to working only part-time.[43] The doctor indicated that the plaintiff would never return to "full duty."[44] On a form checklist provided by Aetna, the plaintiff's doctor also limited his ability to operate a motor vehicle, "hazardous machines," or "power tools."[45]

In October 2011, Aetna calculated the plaintiff's predisability salary as $54,412.80 and found sixty percent of that salary to be $32,647.68, giving the plaintiff an adjusted CPI hourly of $15.89.[46] This calculation assumes that the plaintiff will be able to work full time. After these calculations, Aetna's file noted that based on the plaintiff's restrictions/limitation to part-time work and his work history as a farmer and driver

---

[39] Aetna 291-92.

[40] Aetna 292-302.

[41] Aetna 118-19, 126-28, 331-33, 366. The plaintiff's treating neurologist Dr. Walia did not fill out an attending physician statement and instead referred Aetna to the plaintiff's PCP. Aetna 119, 331.

[42] Aetna 128, 331-33.

[43] Aetna 333, 582.

[44] Aetna 333, 582. See also Aetna 366.

[45] Aetna 366.

[46] Aetna 132.

"there is potential for transferrable skills to alternate occupations [but] it is unlikely occupations will be identified to exist in the [labor market] as part time meeting part time RW of $31.78/hr."[47]

On November 2, 2011, Aetna then contacted the plaintiff's PCP and neurologist to clarify why the plaintiff was restricted to part-time work.[48] The plaintiff's PCP indicated that he could not work more than four hours a day "due to stress which may cause seizure episodes."[49] In the plaintiff's file, an Aetna employee noted: "Do medicals support only part-time work? If not, [disability benefits manager] recommends peer review."[50] The note then reiterated what was already provided by the plaintiff's doctors and concluded with the finding that there was "no medical documentation submitted supporting restrictions and limitations of a 4 hour work day" but that the limitations of "no driving, operating hazardous machinery or working heights is supported due to [history] of seizures."[51] On November 4, 2011, Aetna recommended a neurological peer-to-peer review to determine if the part-time work restriction was supported.[52]

---

[47] Aetna 132.

[48] Aetna 133. Aetna had also contacted Dr. Emmert on October 28, 2011 about this matter but did not reach her. Aetna 133.

[49] Aetna 133.

[50] Aetna 134.

[51] Aetna 134-35.

[52] Aetna 135, 137, 139.

### 1.  Dr. Cohan's Report

Aetna referred the plaintiff's case to Dr. Vaughn Cohan, a neurologist with whom Aetna had contracted, for a peer review.[53] After reviewing the plaintiff's medical records, Dr. Cohan found that his medical information failed "to support functional impairment for the entire timeframe." Dr. Cohan determined that the plaintiff's recommended "safety sensitive restrictions no longer apply" because there was no medical documentation to support these restrictions.[54]  He found "no evidence of any functional impairment to adverse medication effect."[55]  Dr. Cohan noted that "no clinical reports" would prevent the plaintiff from working full-time.[56]

On November 23, 2011, Aetna faxed a copy of Dr. Cohan's report to the plaintiff's neurologist and PCP, asking each to confirm whether the plaintiff could return

---

[53] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 15; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 15. See Aetna 345-48. The defendant noted that Dr. Cohan is not employed by Aetna, as the plaintiff indicates, but is an independent reviewer with whom they have a contract. Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 15. See Aetna 305, 139, 140, 145, 345-48.

Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 13, 14; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 13, 14. See Aetna 135, 133-34, 137. The manager, Ms. Lizette Texidor, first requested an Aetna clinician to conduct a triage review to determine if peer review was needed. Triage clinician Patricia Benjamin agreed that there was a lack of documentation supporting the hours-per-day restriction but that the work-type limitations were appropriate. She recommended that a peer review on the hours-per-day restriction be done. Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 13. See Aetna 135, 133-34, 137, 139.

Aetna 143-44, 346-48. Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 16; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 16.

[54] Aetna 347.

[55] Aetna 143-44.

[56] Aetna 346-47. On December 16, 2011, Aetna noted that Dr. Cohan's report contained two discrepancies: 1) the plaintiff's title was listed as preloader and not package car driver, and 2) the report indicated he was diagnosed with epilepsy and not complex seizure disorder. Aetna 153. Aetna sent the report back to Dr. Cohan for correction. Aetna 153. Aetna received a corrected report on December 16, 2011. Aetna 156.

to full-time work in "any reasonable occupation."[57] Specifically, Aetna requested

"objective clinical exam findings including current office and/or chart notes, along with

any quantifiable documentation…including labs, blood work, x-rays, and the results of

any diagnostic tests showing why Mr. Charles is not able to return to work at the above

mentioned functional capacity."[58] The plaintiff's neurologist responded with a

handwritten note directing Aetna to refer all LTD claims and questions to the plaintiff's

PCP.[59]

In light of Dr. Cohan's report, Aetna's notes indicate that research was done on

whether the plaintiff could serve as a driver at UPS again.[60] After looking at the DOT

regulations, Aetna seemed to determine that he would be covered by the regulations and

could not return to the role of package car driver.[61]

### 2.  Vocational Analysis

Following that determination, Aetna recommended that the file be sent for

vocational analysis.[62] This vocational analysis included both a transferrable skills

---

[57] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 83; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 83; Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 17; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 17. See Aetna 547, 548.

[58] Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 83. See Aetna 548.

[59] Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 16; Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 85; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 85. See Aetna 334, 547-48, 559.

[60] Aetna 154.

[61] Aetna 154-55.

[62] Aetna 155, 158.

analysis and a labor market analysis.[63] The note regarding this vocational analysis indicated that the plaintiff had the following work restrictions and limitations: "no unprotected heights, operating dangerous equipment, or machinery."[64] The note calculated a "reasonable wage hourly amount" to be $16.25.[65] The Adjusted Predisability Earnings and Reasonable Wage Calculation worksheet calculated a reasonable wage to be $16.25.[66] The plaintiff was listed as being able to perform "heavy" work.[67]

The vocational analysis was conducted by Genex Services to determine if the plaintiff could be employed in other "reasonable" occupations based on his skills and earnings.[68] On January 30, 2012, Aetna received the labor market analysis but sent it back to Genex for further clarification.[69] On February 6, 2012, Aetna received the finalized analysis.[70]

Relying on Dr. Cohan's report, Genex found that the plaintiff could perform heavy work.[71] Specifically, the vocational analysis noted that the plaintiff had been seizure-free

---

[63] Aetna 158.

[64] Aetna 163.

[65] Aetna 163.

[66] Aetna 455.

[67] Aetna 163.

[68] Aetna 155, 158, 165, 478. Genex provides the defendant with these services for a fee. Aetna 478. Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 17; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 17. See Aetna 348.

[69] Aetna 169.

[70] Aetna 170.

[71] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 87; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 87. See Aetna 486.

for three years. Genex identified five occupations which the plaintiff could do: "license inspector, freezer operator, mixer operator, warehouse supervisor, and brake adjuster."[72] It concluded that the plaintiff could perform sedentary, light, medium, or heavy work with a reasonable wage of $16.25, making him qualified for such "potential occupations."[73] These were considered to be "potential occupations," which were defined as occupations that the plaintiff can learn "within 30 days and require no previous occupational experience."[74] These positions had a potential earning between $18.74 an hour up to $32.02 an hour, above the plaintiff's reasonable wage of $16.25.[75] They were all listed as being "light" work.[76] These positions would provide the plaintiff with an earning potential within the plan terms of a reasonable wage, assuming that the plaintiff worked full-time.[77]

In looking at local job openings within a hundred-mile radius of the plaintiff's home, Genex determined that there was a viable labor market for these occupations. [78] While the report found that there are usually 1930 annual positions open in those five

---

[72] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 88, 89; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 88, 89. See Aetna 170, 486.

[73] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 88, 89; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 88, 89. See Aetna 369, 486.

[74] Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 25. See Aetna 377.

[75] Aetna 170, 174.

[76] Aetna 170, 174.

[77] Aetna 170, 174, 376.

[78] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 28-44; Defendant's Response to Plaintiff's Response of Material Facts, Doc. No. 39 at ¶¶ 28-44. See Aetna 766, 378-87.

occupations, only four current openings were identified.[79] According to the report, a

viable labor market for the plaintiff did exist.[80]

Genex included several positions in the area as examples of these occupations.

Among these positions were listings for:1) a cargo inspector with BVAO North America

in Philadelphia; 2) a data collection associate for Crossmark in Lancaster, PA; 3) a

forklift operator in Pedricktown, New Jersey; 4) a warehouse lead position in Lancaster,

PA, and 5) and an automobile technician position in Ephrata, PA.[81]

On February 8, 2012, Aetna determined that the plaintiff was no longer eligible for

disability benefits effective February 18, 2012.[82] In a letter dated February 9, 2012, Aetna

terminated the plaintiff's benefits, claiming that there was insufficient medical evidence

in the administrative file to support a part-time work restriction.[83] According to Aetna,

the plaintiff had "the physical capacity to perform reasonable occupations, for which [he

---

[79] Aetna 171, 174-75.

[80] Aetna 171, 175.

[81] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 28-44; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 28-44. See Aetna 766, 378-87.

[82] Aetna 178. The plaintiff's statement indicates that the benefits were terminated on February 9, 2012. The defendant claims the benefits were paid through February 18, 2012. The letter denying benefits was dated February 9, 2012 but it appears the termination was effective February 18, 2012. Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 8, 45; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 8, 45; Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 111; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 111. See Aetna 304-06.

[83] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 8, 13; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 8, 13; Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 111; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 111. See Aetna 135, 304-06.

The parties dispute the reasons why the defendant terminated coverage. See Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 8; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 8; Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 111; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 111. See Aetna 304-06.

was] fitted given [his] education, training, and work experience."[84] Aetna concluded that the plaintiff no longer met the definition of the disabled under the "reasonable occupation" test.[85]

### d. Plaintiff's Appeal of His Denial and Federal Litigation

On March 1, 2012, the plaintiff appealed this determination, according to Aetna's appeals procedure.[86] In support of his appeal, the plaintiff submitted a letter from his PCP dated March 20, 2012 stating that he was restricted to working part-time because the Lacmital used to treat his seizures caused him significant sedation.[87] His physician stated "we must continue to limit his hours worked on a daily basis to 5 per day, for his health and safety, as working longer hours would put him at risk of making mistakes due to fatigue and somnolence, including potentially falling asleep at the wheel on the way home."[88] The letter indicated that the plaintiff was doing well on his current treatment regimen of Lacmital and would recommend its continuation.[89]

---

[84] Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 109; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 109. See Aetna 305.

[85] Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 8, 47; Defendant's Statement of Material Facts, Doc. No. 34 at ¶ 109; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 109. See Aetna 304-05.

[86] Aetna 308. Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 49; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 49. See Aetna 308.

[87] Aetna 335, 729.

[88] Aetna 335.

[89] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 53; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 53. See Aetna 335.

The defendant contends that this letter was written for the purposes of litigation and conflicts with prior medical records from Emmet's office. Defendant's Statement of Material Facts, Doc. No. 34 at ¶¶ 154, 155; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶¶ 154, 155. See Aetna 333, 728-30, 627-31, 615-17, 447.

On April 25, 2012, Aetna informed plaintiff's counsel that they would issue a

timely decision by May 26, 2012.[90] On May 29, 2012, Aetna informed plaintiff's counsel

that it needed an additional 30 days to issue a decision, as permitted by the Plan.[91]

Aetna referred the plaintiff's case for another peer review.[92] This review was

conducted by Dr. Kenneth Root, and his report was issued on June 4, 2012.[93] Dr. Root

noted that though the plaintiff's seizures were well controlled by medication, "it would be

advisable and reasonable to recommend a job in which the claimant would not be driving,

working in high places, such as ladders or rooftops, and to avoid using power equipment,

if at all possible."[94] In interpreting the plaintiff's doctor's previous restriction to part-time

work, Dr. Root noted that "[d]riving to and from work is not considered a job

responsibility…."[95] Dr. Root then stated that there were no findings of neurological

functional impairment due to the plaintiff's medication side effects from the time period

of 2/18/12 to 5/31/12.[96] He went on to say that the plaintiff was "experiencing some

fatigue after four to five hours, presumably due to lamotrigine, but this has not been

---

[90] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 50; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 50. See Aetna 310.

[91] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 51; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 51. See Aetna 311, 312.

[92] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 55; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 55. See Aetna 117, 119, 321-24.

[93] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 55; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 55. See Aetna 321-24.

[94] Aetna 324.

[95] Aetna 324.

[96] Aetna 324.

documented."[97] Ultimately, Dr. Root found that "there [was] a lack of documented evidence of objective neurological functional impairment in the claimant from 2/18/12 to 5/31/12 which would preclude him from working any occupation."[98] Part of his decision relied upon the fact that the plaintiff had not visited either his PCP or his neurologist during that time frame.[99]

On June 25, 2012, Aetna contacted the plaintiff's neurologist in order to clarify what the plaintiff's impairment and functionality level was.[100] On August 30, 2012, the plaintiff's attorney sent Aetna a letter demanding a decision, which was several months overdue.[101]

On September 5, 2012, Aetna finally rendered a decision, affirming the plaintiff's denial of benefits, again reiterating that no medical evidence supporting a finding of disability.[102] On September 10, 2012, the plaintiff requested a copy of his administrative file from Aetna.[103] On October 16, 2012, the plaintiff filed this action against Aetna and

---

[97] Aetna 324.

[98] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶ 55; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 55. See Aetna 323.

[99] Aetna 324.

[100] Aetna 313.

[101] Aetna 319. It appears that Aetna also continued to send information to the plaintiff's attorney at a wrong address up through the appeals process. Aetna 319.

[102] Aetna 314-16. The Booklet-Certificate also provides that Aetna must notify a plan participant of the outcome of their appeal within 45 days of the receipt of the appeal. See Aetna 769. Aetna can request an additional 45 days within which to make its decision, but no more. See Aetna 769. Overall, Aetna has 90 days within which to render a decision on appeal. Aetna 770.

[103] Compl., Doc. 1 at 6.

the UPS National LTD Plan.[104] He claims that the defendants violated his rights under ERISA by both denying him LTD benefits and by failing to provide him with the plan document and his administrative file within the requisite time frame. The parties filed cross motions for summary judgment.

## II.    STANDARD OF REVIEW FOR COUNT I

The parties dispute which standard of review applies to the plaintiff's LTD benefits denial. "[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When an administrator or fiduciary is given discretion, a court reviewing a denial reviews the administrative record to determine if the administrator's decision was the arbitrary and capricious or an abuse of discretion. See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997); Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009). Under the abuse-of-discretion standard, a court "may overturn an administrator's decision only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Viera v. Life Ins. Co. of North America, 642 F.3d 407, 413 (3d Cir. 2011)(quoting Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011)). In other words, the court's ability to reverse a denial under the arbitrary and capricious standard is narrower than if the standard of review is *de novo*.

---

[104] The case was first filed in state court and subsequently removed by Aetna to federal court. See Doc. No. 1.

"Whether a plan administrator's exercise of power is mandatory or discretionary depends on the terms of the plan." Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir.1991). A plan may expressly or implicitly confer discretionary powers on a plan administrator or other fiduciary. See id. "[T]he terms of the plan are construed without deferring to either party's interpretation." Id. (quoting Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989)). The party claiming that the arbitrary and capricious standard applies bears the burden of proving that its decision should be given deference. See Viera, 642 F.3d at 413 (citing Kinstler v. First Reliance Std. Life Ins. Co., 181 F.3d 243, 249 (2d Cir.1999)). For this reason, the standard of review is typically a legal determination that can be decided on a motion for summary judgment.[105]

### a. The Structure of the Plan

Two documents together serve as the terms of the LTD Plan: the Booklet-Certificate for "Long Term Disability Benefits" and the Group Accident and Health

---

[105] The parties previously raised the question of the appropriate standard of review as part of a discovery dispute. At that time, I declined to determine the standard of review—which did not affect that outcome of that dispute—because the documents provided by the parties appeared to be incomplete and unclear as to what constituted the plan document. The Policy itself appeared to be missing several pages. Though the documents themselves are consecutively Bates-stamped, the original pagination of the Policy skips pages at a time in several places. See Aetna 832-40. Several sections listed in the table of contents of the Policy also do not appear to be included. See Aetna 830.

In making their arguments in these motions, the defendants have further explained how the two documents relate to one another. Aetna provided affidavits of employees who swear that the documents provided are the only ones that apply to the LTD Plan. See Doc. No. 39, Ex. 1 and 2.

During a telephone conference with counsel, defense counsel further clarified that the Policy is a form document that may be used by Aetna for other types of plans. Though the pagination on the Policy document is not consecutive (i.e. there appear to be pages missing), defense counsel has assured the court that this was the document intended to serve as the Policy for the LTD Plan and the pages offered from the Policy were what was presented to UPS and Aetna when they formed the UPS LTD Plan.

Insurance Policy.[106] The Policy is a form document or "shell."[107] It "sets out the terms and conditions governing the relationship between UPS and Aetna and Aetna's duties."[108] The Policy is an agreement entered into between Aetna and UPS as the Policyholder.[109] It states that the "Policy Contents" includes all provisions within the Policy itself and those included in the Booklet-Certificate for "Long Term Disability Benefits.[110]

The Booklet Certificate is the Summary Plan Description (SPD) for the Plan but also serves as part of the plan document.[111]  The Booklet-Certificate states that coverage under the LTD Plan is "subject to all the conditions and provisions of the *Group Insurance Policy*" and is, in fact, "part of the Group Insurance Policy."[112] The Booklet-Certificate lays out the specific terms of coverage for LTD benefits.[113] It "describes the main features of the plan" and "[a]dditional provisions are described elsewhere in the

---

[106] Doc. No. 21, Ex. 2 and 3, Aetna 745-845.

[107] See Aetna 773 (describing the "Group Policy" as consisting of "a policy 'shell' containing general provisions relating to policyholder/insurance company matters and a certificate (including the Schedule of Benefits) containing the complete plan of benefits.").

Information contained in the plan audit attached to the UPS National LTD Plan Form 5500 supports this possible trust configuration. The audit report prepared by Deloitte describes the plan as being funded by the UPS Health and Welfare Plan Trust for Collectively Bargained Employees (VEBA or "Master Trust"). This Master Trust also funds many other UPS employee benefits plans including health plans for different subsets of employees (i.e. part-time employees, retirees, etc.). See UPS National LTD Plan Form 5500 (2010-2012), available at https://www.efast.dol.gov/portal/app/disseminate?execution=e2s1

[108] Defendant's Brief in Support, Doc. No. 35 at 4.

[109] Aetna 829.

[110] Aetna 833; 840.

[111] Aetna 745; 747.

[112] Aetna 745, 747.

[113] Defendant's Brief in Opposition, Doc. No. 38 at 6. Aetna 748-72.

*group policy.*"[114] While the Booklet-Certificate includes terms and conditions which could only be interpreted as relating to LTD benefits, the Policy contains language which could apply to other UPS plans.

### b.  Arbitrary and Capricious is the Standard of Review

The defendants claim the standard of review is "arbitrary and capricious" because the Group Accident and Health Insurance Policy gives Aetna discretion in making LTD benefits decisions. The plaintiff argues that the discretionary language in the Policy does not apply to the LTD Plan but instead applies to the UPS Group Accident and Health Insurance Plan, based on the title of the Policy.[115]

The discretionary language cited by the defendants is found in the section titled "Administrative Matters" of the Policy. It states:

> We [Aetna] have discretionary authority to review all denied claims for benefits under this Policy. This includes, but is not limited to, the denial of certification of the **medical necessity** of hospital or medical treatment."
>
> In performing its review, We shall have discretionary authority to determine whether and to what extent employees and beneficiaries are

---

[114] Aetna 759.

[115] See Plaintiff's Brief in Support, Doc. No. 30 at 9; Plaintiff's Brief in Opposition, Doc. No. 37 at 10. The plaintiff points out that the Summary Plan Description and the Form 5500, the annual reporting the plan must make to the Department of Labor, both title the plan as the UPS National LTD Plan, not the Group Accident and Health Insurance Plan. Plaintiff's Brief in Opposition, Doc. No. 37 at 8. A review of the Department of Labor publicly-available Form 5500 database shows that UPS has close to twenty different ERISA-covered employee benefits plans, including the UPS National LTD Plan. None of these are titled the UPS Group Health and Accident Insurance Plan. Some are health plans, while at least one deals with accident insurance.

To further confuse this point, the plan associated with the plan number found in the Booklet-Certificate (Plan Number 536) is the UPS Health and Welfare Package Select. See Aetna 770; https://www.efast.dol.gov/portal/app/disseminate?execution=e2s1.  The UPS National LTD Plan is listed as having a different plan number (Plan Number 505) in the Form 5500 database; the plan audits attached to the LTD Plan Form 5500s also identify the plan number as being 505. While I cannot say that the different titling in itself disposes of the issue, it does at least counter Aetna's argument that the Policy language would necessarily apply to the LTD Plan and not to another UPS Plan.

entitled to benefits; and construe any disputed or doubtful terms of this Policy.

We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously. We have the right to adopt reasonable policies, procedures, rules; and interpretations of this Policy to promote orderly and efficient administration.

Doc. No. 21, Ex. 3 at 48 (Aetna 842)(emphasis in original).[116]

The plaintiff argues that the reference to "medical necessity" indicates that the provision applies to some sort of health insurance plan, not a LTD Plan.[117] While I agree that the language regarding medical necessity would imply a relation to a health plan, this superfluous language does not necessarily render the previous sentence invalid. That sentence clearly states: "We have discretionary authority to review *all* denied claims for benefits under this Policy." (emphasis added).[118] The Policy includes LTD benefits.[119] By the clear language of the terms of the Plan, Aetna has been given discretionary authority over all benefits determination decisions under the Policy, including LTD benefits

---

[116] Though the document itself does not define who "We" is, in context, it would appear that "We" is "Aetna."

[117] The plaintiff also makes the argument that the Booklet-Certificate is silent on the issue of discretion. The plaintiff acknowledges that the Booklet-Certificate (SPD) is a part of the Policy, but also says that the Policy is not a part of the LTD Plan, based on the fact that it is titled "Group Accident and Health Insurance Policy" and not "UPS National LTD Plan.". See Plaintiff's Brief in Opposition to Defendants' MSJ, Doc. No. 37at 8. I don't quite follow the plaintiff's logic in saying that the Booklet-Certificate is a part of the Policy yet the language in the Policy does not apply to the LTD.

[118] Aetna argues that the language in the Policy has been approved by other courts as granting discretionary authority. While this may be true, I am required to interpret the language within the context of the Plan document presented in this case. Defendant's Brief in Support of Their Motion for Summary Judgment, Doc. No. 35 at 8-9. See Viera, 642 F.3d at 414-18 (explaining whether language in "Proof of Loss" provision is sufficient to confer discretionary authority). It is not clear that the other cases approving this language were necessarily working from the same plan document offered here.

[119] Aetna argues that the Group Policy Number offers evidence that both documents are a part of the same plan. While it is true that the Group Policy Number GP-863204 is found in both the Booklet-Certificate and the Group Policy itself, this is not dispositive. See Aetna 747, 829, 844. What this Group Policy number signifies is not well explained. If the Group Policy Number (as its name denotes) simply refers to the number of the umbrella Group Policy, it may not be exclusive to the LTD Plan. It may be a number which identifies the umbrella policy and is thereby also found in any of the plans which may be covered by that Group Policy.

decisions.[120] For this reason, the standard of review is arbitrary and capricious or abuse of discretion.

The plaintiff argues that the standard is *de novo* because the plan does not state that the Plan administrator's authority has been delegated to Aetna. The plaintiff cites no binding law for this proposition. Who serves as the plan administrator is somewhat of an open question. UPS is listed as the plan administrator in the Booklet-Certificate.[121] Yet, several documents sent to the plaintiff indicate that Aetna is the plan administrator.[122]

In deciding the standard of review, however, this point has little relevance. The terms of the plan may confer discretionary authority implicitly to a third party. When discretion to make benefits determinations is conferred on a non-named fiduciary, that person or entity will be considered a fiduciary of the plan. "[O]ne is a fiduciary to the

---

[120] I will note that some of the language in the Policy does appear to be superfluous to the LTD Plan. For example, the section "Premium Rate Reduction for Failure to Meet Performance Guarantees" states that "[t]he reduction will apply **only to the Long Term Disability Coverage issued under this policy**." Aetna 835 (emphasis added). The "Schedule of Premiums and Fees" states that "[t]he current premium rates for **all of the Accident and Health Coverages provided under this policy** are on record with both Aetna and the Policyholder." Aetna 836 (emphasis added). The "Termination" section indicates that "We may terminate this Policy as to any of **all coverage, other than the Health Expense Coverage**…" Aetna 838 (emphasis added). The Inconstestability" section provides it is only "[a]s to Accident and Health Benefits." Aetna 842. If the Group Accident and Health Insurance Policy is one in the same with the UPS National LTD Plan, as the defendant argues, these phrases would be unnecessary.

Another example is found in the "Termination" section. This section discusses "Health Expense Coverage," which defined as including medical, dental, and health benefits. Aetna 838. That section later references a participant's "prior health coverage." Aetna 839. These provisions seem more apropos to a health plan than an LTD benefits plan.

The Group Policy also contains several pages which outline certain insurance provisions and limitations under state laws. See Aetna 774-828. These state law notices discuss regulations that relate to various types of insurance including medical/health, life, and accident.

It is not clear whether this superfluous language does apply to other UPS plans (i.e. the Policy applies to several plans as an "umbrella" document of sorts) or whether the Policy form document was not redacted well to take out those provisions which would not apply to the LTD Plan. Regardless, the language at issue is clear that any benefits determinations under the Policy allow for deference. The LTD Plan is one of the plans contained in the Policy.

[121] Aetna 770.

[122] Aetna 251, 256.

extent he exercises *any* discretionary authority or control." Firestone Tire & Rubber Co.

v. Bruch, 489 U.S. 101, 115 (1989)(emphasis in original). See also §405 of ERISA, 29

U.S.C. § 1105(c)(explaining when a named fiduciary may delegate fiduciary duties to a

non-named party thereby making that non-named person or entity liable for a breach of

fiduciary duties). Here, the Plan Document gives Aetna discretion to make benefits

determinations. Even if UPS is the plan administrator in name, UPS has implicitly

delegated its authority to make benefits determinations to Aetna in the Plan Document.

Aetna is, thereby, liable for a fiduciary breach from a benefits determination.

The plaintiff also argues that the UPS Plan does not contain any provision

allowing it to designate fiduciary duties to another party, citing to §405 of ERISA, 29

U.S.C. § 1105.  Section 405 discusses "liability for breach of co-fiduciary." Section

1105(c) states that "a plan may expressly provide for procedures…for named fiduciaries

to designate a person other than named fiduciaries to carry out fiduciary

responsibilities….If a plan expressly provides for a procedure…and pursuant to such

procedure any fiduciary responsibility of a named fiduciary is allocated to any

person…then such named fiduciary shall not be liable for an act or omission of such

person in carrying out such responsibility" except for certain situations.  This section

explains how a named fiduciary may delegate its fiduciary responsibilities to non-

fiduciaries, thereby making persons not named as fiduciaries subject to liability under

ERISA. See Marx v. Meridian Bancorp, Inc., No. 01-2918, 32 Fed.Appx. 645, 650 (3d

Cir. Mar. 27, 2002). See also Confer v. Custom Engineering Co., 952 F.2d 34, 37 (3d Cir.

1991)("ERISA permits a plan to designate more than one fiduciary, 29 U.S.C. §

1102(a)(1), and ERISA permits a plan to provide for a procedure by which a named fiduciary can designate others as fiduciaries, 29 U.S.C. § 1105(c)(1)(B).").

When a third party who has not been given discretionary authority to do so by the plan itself makes benefits determinations, the delegation of authority confer deference on those benefits decisions. For example, in Anderson v. Unum Life Ins. Co. of America, 414 F.Supp.2d 1079 (M.D. Ala. 2006)—a case cited by the plaintiff—discretionary authority was granted by the plan to Unum. Id. at 1095. However, the court found that the deferential standard of review did not apply to a benefits decision because it was made by UnumProvident employees, not Unum employees. Id. at 1095-96, 1100. Unum did not have the authority under the Plan to delegate its discretionary authority to UnumProvident. Id. at 1100. See also Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583-85 (1st Cir. 1993)(finding that deference not required because Plan Administrator was not given deference by the plan document, only Named Fiduciaries; Plan Administrator made the benefits determination); Sanford v. Harvard Industries, Inc., 262 F.3d 590, 596-97 (6th Cir. 2001)("Harvard's plan specifically clothes the Board with discretionary authority to decide benefits eligibility. Nevertheless, the court determined that it was not the Board that denied Sanford his benefits, but rather the company at a meeting prompted by a union grievance held under the auspices of the CBA….Having ascertained that the decision to revoke Sanford's benefits was made by an unauthorized body and not by the Board, the district court concluded that it was appropriate to review Harvard's denial of benefits de novo."); Davidson v. Liberty Mutual Ins. Co., 998 F.Supp. 1, 8 (D. Me. 1998)(standard of review is de novo because Liberty Life made claims

decisions, but plan only grants discretion to Liberty Mutual). However, this is not our case. Here, Aetna was given discretionary authority by the terms of the Plan. The plaintiff's argument is not applicable.

I will review Aetna's decision under the arbitrary and capricious or abuse of discretion standard.[123]

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden,

---

[123] I allowed the plaintiff to take the deposition of Danielle Caldwell, a senior appeals specialist at Aetna, to explore possible conflicts of interest. The information the plaintiff puts forth about this deposition relates to procedural irregularities, not to bias. That information would only be appropriate to review if the standard is *de novo*, which I find it is not. I will not consider this information on summary judgment.

the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.   Count I: Plaintiff's ERISA Claim Based on Denial of Benefits

The plaintiff's first claim alleges a violation of the Employee Retirement Income Security Act (ERISA) under 29 U.S.C. § 1132(a)(1)(B). This section allows an ERISA-covered plan participant to bring a civil action against the Plan "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the plan."[124] 29 U.S.C. §

1132(a)(1)(B). The plaintiff's main contention is that Aetna's benefits determination did

not comply with the terms of the UPS LTD Plan.

The parties dispute several points about the benefits determination, but I see none

as genuine disputes of material fact. These disputes center on whether there was or was

not medical evidence in the record to support the benefits determination. The

administrative record has been provided by the court. Under the abuse-of-discretion

standard, a court "may overturn an administrator's decision only if it is 'without reason,

unsupported by substantial evidence or erroneous as a matter of law.'" Viera v. Life Ins.

Co. of North America, 642 F.3d 407, 413 (3d Cir. 2011)(quoting Miller v. Am. Airlines,

Inc., 632 F.3d 837, 845 (3d Cir. 2011)). Whether the decision was not supported by

evidence in the record—making it an abuse of discretion—is something this court can

decide on summary judgment. After reviewing the administrative record, I find that

Aetna's benefits determination was an abuse of discretion, for the reasons explained

below.

### a.  Requiring Clinical or Objective Evidence Was an Abuse of Discretion

First, Aetna argues that there was insufficient medical evidence to support a

finding of impairment. Specifically, Aetna argues that there was no clinical evidence to

show that the plaintiff's seizure medication adversely affected him, requiring a restriction

to part-time work. This was Aetna's rationale for denying the plaintiff's claim on

---

[124] There is no dispute about whether the Plan is covered by ERISA.

appeal.[125] Aetna's denial of the plaintiff's claim based on a lack of clinical evidence was an abuse of discretion.

Several documents from the plaintiff's physicians indicate that he was experiencing fatigue from taking Lacmital, which could impact his workplace safety. In May 2010, the plaintiff's PCP submitted an Attending Physician Statement which stated that the plaintiff could not drive, climb, or operate machinery as part of his work.[126] The statement listed "Lacmital" as a medication prescribed and noted that "sedation" was a side effect of that medication. While this statement did not restrict the plaintiff to part-time work, it did indicate that the plaintiff's restrictions on the type of work he could do were in place "indefinitely" and that the plaintiff could "never" return to full duty as a package car driver.[127]

In August 2011, the plaintiff's PCP submitted an attending physician statement that said the plaintiff could perform "heavy physical demand level work" but must "avoid heights, no driving, climbing or operating heavy machinery."[128] The statement also noted that the plaintiff was still taking Lacmital but noted no adverse effects from the

---

[125] Aetna 207.

[126] See Aetna 395-96.

[127] In the plaintiff's administrative file were progress notes from his primary care physicians. 400-442. A note from December 7, 2009 indicates that the plaintiff will "be on anti-seizure medication for the rest of his life." Aetna 441. The note also states that the plaintiff is "not really taking anything other than the Lamictal" but is "not having side effects." Aetna 441. The notes also indicate that the plaintiff was having trouble sleeping. The doctor prescribed him Ambien for his insomnia. His doctor did not specifically link the insomnia to the Lacmital but noted that condition was being treated. Aetna 439.

[128] Aetna 118-19, 126-28, 331-33, 366.

medication.[129] His doctor limited the plaintiff to only working 4 hours a day.[130] The doctor indicated that the plaintiff would never return to "full duty."[131] On a form checklist provided by Aetna, the plaintiff's doctor indicated that the plaintiff could not operate a motor vehicle, "hazardous machine," or "power tools."[132] These restrictions were considered to be "lifelong." The plaintiff's treating neurologist did not fill out an attending physician statement and instead referred Aetna to the determinations made by the plaintiff's PCP.[133]

When Aetna contacted the plaintiff's PCP about whether the part-time work restriction was necessary, the plaintiff's PCP explained that the plaintiff could not work more than four hours a day "due to stress which may cause seizure episodes;" this is noted in the plaintiff's file.[134] After the plaintiff's claim was denied, the plaintiff's physician provided a letter stating: "we must continue to limit his hours worked on a daily basis to 5 per day, for his health and safety, as working longer hours would put him at risk of making mistakes due to fatigue and somnolence, including potentially falling asleep at the wheel on the way home."[135]

---

[129] Aetna 128, 331-33.

[130] Aetna 333, 582.

[131] Aetna 333, 582. See also Aetna 366.

[132] Aetna 366.

[133] Aetna 119, 331.

[134] Aetna 133.

[135] Aetna 335.

In addition, Aetna's own files offer evidence that a part-time work restriction was necessary. Aetna's reason for finding that the plaintiff was disabled in the first place was because he was taking Lacmital and was subject to the restrictions of no climbing, driving, or operating machinery by his PCP.[136] The administrative file itself notes that the plaintiff's disability decision was further "supported" by that fact that that he had returned to work with hourly restrictions.[137]

Though Dr. Root ultimately found that the plaintiff was not impaired, he noted that the plaintiff was "experiencing some fatigue after four to five hours, presumably due to lamotrigine...."[138] Dr. Root noted that though the plaintiff's seizures were well controlled by medication, "it would be advisable and reasonable to recommend a job in which the claimant would not be driving, working in high places, such as ladders or rooftops, and to avoid using power equipment, if at all possible."[139]

The defendants further argue that there was no *clinical* or "objective" evidence to support the restrictions placed on the plaintiff. Both Dr. Cohan and Dr. Root made this point in determining that the plaintiff was not disabled.[140] Though it's not clear what type of clinical evidence Aetna thought was missing, Aetna implicitly argues that the

---

[136] Aetna 69, 74. The plaintiff's received primary care medical treatment from Manor Family Health Center. Dr. David Emmert, Dr. Catherine Edmonds, Dr. Peter Altimare, Dr. Robert Baird, and Dr. Richard Gayeski were all associates at Manor with whom the plaintiff dealt. Dr. Walia was the plaintiff's neurologist. See, e.g., Aetna 407, 408, 409, 582, 611.

[137] Aetna 85.

[138] Aetna 324.

[139] Aetna 324.

[140] Aetna 346-47; Aetna 323.

plaintiff's self-reported feelings of fatigue and his doctor's diagnosis  that Lacmital

caused this sedation were not enough to show disability.[141] Aetna's expectation that the

plaintiff should undergo some additional "clinical" test to prove that he is, in fact,

experiencing fatigue from his medication is arbitrary and capricious. See Mitchell v.

Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997)(finding that requiring clinical

evidence to prove plaintiff had chronic fatigue syndrome, a condition with no "dip stick"

lab test was arbitrary and capricious).[142]

The Food and Drug Administration has indicated that tiredness, insomnia, lack of

coordination, headache, dizziness, blurred vision, and sleepiness are all common side

effects of Lacmital.[143] As with every medication, some people are more affected by a

drug than others. Continuous monitoring by a physician is typically how people

determine what the right drug treatment is for their condition. Mr. Charles' physicians

were continuously monitoring his treatment with Lacmital. Both his neurologist and PCP

---

[141] Dr. Root also based his finding on that fact that the plaintiff had not seen his neurologist or his family doctor recently. Aetna 323. That characterization of the facts is a bit misleading. The plaintiff's physicians both indicated that he should continue on his current treatment plan—taking Lacmital to control his seizures—until his next visit. See Aetna 335. For both doctors, the plaintiff was instructed to check in yearly for his seizure condition. To have expected him to see his doctors more than that, when his treatment regimen was working, is unreasonable in context. Dr. Root himself noted that "[a]pparently, [the plaintiff] is doing well on his current regimen." Aetna 323.

[142] See, e.g., Heim v. Life Ins. Co. of North America, No. 10–1567, 2012 WL 947137, at *7-9 (E.D. Pa. Mar. 21, 2012)("LINA declined to consider Heim's subjective reports of such pain and fatigue, instead insisting on 'clinical documentation' and 'clinical findings.' LINA also failed to credit Dr. George's opinion as a clinical finding because it was based on Heim's reports of pain and fatigue. This was improper."); Elms v. Prudential Ins. Co. of America, No. 06-5127, 2008 WL 4444269, at  *14  (E.D. Pa. Oct. 2, 2008)("[P]lan administrators must be wary of denying claims because of a lack of objective evidence when the disabling condition on which the claimant rests her case rests heavily on subjective evidence."); Morgan v. The Prudential Insu. Co. of America, 755 F.Supp.2d 639, 649 (E.D. Pa. 2010)(requiring objective evidence for fibromyalgia, a condition with no clinical test, was arbitrary and capricious).

[143] See http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152835.pdf.

found that this treatment was successful and should remain unchanged. To expect more under these circumstances is an abuse of discretion.

### b. Aetna had an inherent conflict of interest which appeared to have tainted its decision

The plan defines a "reasonable occupation" as "any gainful activity" for which a participant is "or may reasonably become, fitted by education, training, or experience; and [w]hich results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings."[144] Aetna calculated the plaintiff's predisability salary as $54,412.80 and found sixty percent of that salary to be $32,647.68, giving the plaintiff an adjusted CPI hourly of $15.89.[145] This calculation assumes that the plaintiff will be able to work full time.

After these calculations, Aetna noted that based on the plaintiff's restrictions/limitation to part-time work and his work history as a farmer and driver "there is potential for transferrable skills to alternate occupations [but] it is unlikely occupations will be identified to exist in the [labor market] as part time meeting part time RW of $31.78/hr."[146] After this note was written, Aetna sought to "clarify" whether the part-time restriction was necessary, ultimately concluding that it was not.

When the administrator having discretion over claims determinations is an insurance company which both evaluates and pays benefits under the plan, an inherent

---

[144] Aetna 766. Aetna calculated the plaintiff's predisability salary as $54, 412.80 and found sixty percent of that salary to be $32,647.68, giving the plaintiff an adjusted CPI hourly of $15.89. Aetna 132.

[145] Aetna 132.

[146] Aetna 132.

conflict of interest exists. See Culley v. Liberty Life Assur. Co. of Boston, No. 07-3952, 339 Fed.Appx. 240, 242-43 (3d Cir. Jul. 20, 2009)(discussing Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 112-15 (2008)). This conflict of interest is one factor that a court should consider when deciding if a benefits determination was an abuse of discretion. Glenn, 554 U.S. at 115-19 (explaining Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989)). Aetna is an insurance company that both evaluates and pays for LTD benefits under the Plan. This situation presents a conflict of interest. This conflict does appear to have influenced Aetna's decision. From the beginning of the "reasonable occupation" review, Aetna's notes indicate that its biggest concern was with the bottom line.

After determining that the plaintiff would need to be making over $30 hour under his current restrictions, Aetna then referred his case for a peer-to-peer review to determine if the part-time restriction only (not any of the other restrictions) was necessary.[147] This sequence of events raises questions about the propriety of Aetna's ultimate decision.

### c.   Aetna's Use of the Plaintiff's Vocational Analysis Was an Abuse of Discretion

The plaintiff argues that the vocational analysis offered jobs that were not "reasonable" under the terms of the plan, given the plaintiff's noted work

---

[147] Aetna 137, 139.

restrictions.[148]  I agree.

After reviewing the plaintiff's medical evidence and before referring the plaintiff's file for a peer review and vocational analysis, Aetna's file noted that the part-time restriction was not supported by the medical evidence but that "[t]he limitations of no driving, operating hazardous machinery or working heights is supported due to hx of seizures."[149]  The plaintiff's case was then referred to Dr. Cohan and to Genex for a vocational analysis.

Dr. Cohan found that the plaintiff's safety restrictions were no longer necessary because he remained seizure-free for three years.[150]  Aetna claims Genex was given both Dr. Cohan's report and the plaintiff's other medical information.[151]  Nonetheless, it does not appear that Genex seriously considered the work restrictions imposed by the plaintiff's doctors in conducting its vocational analysis.

The vocational analysis identified five occupations which the plaintiff could do: "license inspector, freezer operator, mixer operator, warehouse supervisor, and brake

---

[148] The plaintiff contends that these positions were not "reasonable" given the distance the plaintiff would need to travel, the type of work required, the hourly wage of the positions, the overall potential earnings from the positions, and/or the plaintiff's work experience. Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 28-44.

[149] Aetna 135.

[150] Aetna 543.

[151] The parties do dispute whether Genex received the plaintiff's medical information. The plaintiff claims that Aetna did not give Genex the plaintiff's primary care physician's restrictions and limitations for its vocational analysis. Aetna claims that Genex was provided with this information. The vocational analysis itself only states that Dr. Cohan's report was a part of the medical evidence received. Aetna 462. This factual dispute is not material. If Genex was not given these restrictions and the plaintiff's other medical information, that would show an abuse of discretion and favor a judgment for the plaintiff. If Genex were given these restrictions, it does not appear that they considered them in making their decision, as I will explain. This too would lead to a finding that Aetna abused its discretion. The resolution of this dispute would not affect the outcome of this decision.

adjuster."[152]  These were considered to be "potential occupations," which were defined as occupations that the plaintiff can learn "within 30 days and require no previous occupational experience."[153] These positions had a potential earning between $18.74 an hour up to $32.02 an hour.[154] They were all listed as being "light" work.[155]

By the very nature of the job titles, the plaintiff would be unqualified to be a freezer operator or a mixer operator, based on his work restrictions. The plaintiff was restricted from "operating dangerous equipment[] or machinery." The forklift operator position, an example of a job falling in these categories of work, would require the plaintiff to drive a forklift.[156] The report also noted that this job may not be appropriate because the "[f]lashing beacons may trigger epileptic fits."[157] Given the circumstances, the plaintiff would be unqualified for this type of position.

In addition, the vocational analysis did not comply with the plan terms and/or Aetna's interpretation of those plan terms. The plaintiff has no experience working in the automotive industry. To expect him to become trained in this area of expertise within 30 days or to not have prior experience in this area is contradicted by the report itself. The

---

[152] Defendant's  Statement of Material Facts, Doc. No. 34 at ¶ 88, 89; Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 36 at ¶ 88, 89. See Aetna 170, 486.

[153] Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶ 25. See Aetna 377.

[154] Aetna 170, 174.

[155] Aetna 170, 174.

[156] Aetna 383.

[157] Aetna 383.

automotive technician position offered as an example required at least one year of experience repairing cars.[158]

In looking at local job openings within a hundred-mile radius of the plaintiff's home, the vocational analysis determined that there was a viable labor market for these occupations.[159] While the report found that there are usually 1930 annual positions open in those five occupations, only four current openings were identified.[160] Yet the report still found that a "viable labor market" for the plaintiff did exist.[161]

These openings by their very qualifications failed to account for the plaintiff's medical limitations. The cargo inspector position, data collection associate position, and automotive technician position required valid driver's licenses.[162] Though it is not clear if the three jobs require driving as part of their job responsibilities, the details imply that driving may be required. To think that the plaintiff would be qualified for those positions when he could not return to his driver position with UPS is illogical. A medical professional nor a vocational analyst is needed to come to that conclusion.

The fact that Aetna determined that a "reasonable" job market for the plaintiff was a 100-mile-radius of his home was also an abuse of discretion under the circumstances.[163]

---

[158] Aetna 386.

[159] Plaintiff's Statement of Material Facts, Doc. No. 31 at ¶¶ 28-44; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. No. 39 at ¶¶ 28-44. See Aetna 766, 378-87.

[160] Aetna 171, 174.

[161] Aetna 171, 175.

[162] Aetna 377, 380, 386.

[163] This hundred-mile limit is not in the plan terms. While it is true that Aetna has been given discretion to interpret plan terms, using 100 miles as the benchmark in this case would be unreasonable under the circumstances.

The plaintiff's medical condition prevents him from driving long distances. The plaintiff himself indicated that he did not drive far for that reason. His PCP also indicated that his medication could cause sedation if he worked a full day, potentially causing him to fall asleep at the wheel. To expect the plaintiff to commute from his home in Lancaster to Philadelphia or to Predericktown, both of which would require at least one hour's commute one way, is unreasonable.

Viewing all of these facts together, Aetna's reliance on the vocational analysis as evidence for its decision would be an abuse of discretion.

### d.  Aetna's Treatment of the Plaintiff's Appeal is an Abuse of Discretion

From the record provided, Aetna did not seem to consider the additional information offered by the plaintiff in rendering its appeal decision. In support of his appeal, the plaintiff submitted a letter from his PCP stating that he was restricted to working part time because the Lacmital used to treat his seizures caused him significant sedation.[164] His physician stated "we must continue to limit his hours worked on a daily basis to 5 per day, for his health and safety, as working longer hours would put him at risk of making mistakes due to fatigue and somnolence, including potentially falling asleep at the wheel on the way home."[165]

During the plaintiff's appeal, Aetna referred his case to Dr. Root for a second peer review. In line with the plaintiff's doctors, Dr. Root's report found that the plaintiff's

---

[164] Aetna 335, 729.

[165] Aetna 335.

safety restrictions were warranted and that "it would be advisable and reasonable to recommend a job in which the claimant would not be driving, working in high places, such as ladders or rooftops, and to avoid using power equipment, if at all possible."[166] He also went on to say that the plaintiff was "experiencing some fatigue after four to five hours, presumably due to lamotrigine, but this has not been documented."[167] These findings cast doubt on Aetna's reliance on the vocational analysis and on Dr. Cohan's report in making its initial decision.

There is no indication in the record that Aetna did anything to resolve these conflicting medical opinions or to include this additional information into its analysis. For example, Aetna did not order an independent medical examination. See Morgan v. The Prudential Insu. Co. of America, 755 F.Supp.2d 639, 647 (E.D. Pa. 2010)("Dr. Howard did not physically examine Morgan. The absence of an examination is a factor in analyzing the differences in the opinions of the consultant and the treating physician.") (citing Kaufmann v. Metro. Life Ins. Co., 658 F.Supp.2d 643, 650 (E.D. Pa. 2009)). Aetna was not required to conduct an independent medical examination of the plaintiffs. See, e.g., Thompson-Harmina v. Reliance Standard Life Ins. Co., No. Civ.A.04–425, 2004 WL 2700342, at *3 (E.D. Pa. Nov. 23, 2004). "However, where the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a

---

[166] Aetna 324.

[167] Aetna 324.

records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits." <u>Morgan</u>, 755 F.Supp.2d at 647.[168]

There is also no evidence in the record to show that Aetna reconsidered its use of the vocational analysis, which had not considered the restrictions recommended by Dr. Root. The record itself provides very little information about what steps were taken during the six months the plaintiff waited for his appeal decision. A referral for a peer review is the only action noted.[169] From what has been provided, the only logical conclusion is that Aetna simply affirmed its previous decision. This is inappropriate.

Overall, Aetna's determination appears to have given great weight to their own experts while giving little, if any, consideration to the plaintiff's own treating physicians.[170] Without further explanation, this is an abuse of discretion. <u>See</u> <u>Ricca v. Prudential Ins. Co. of Am.</u>, 747 F.Supp.2d 438, 445-46 (E.D. Pa. 2010)("Given the conflicting evidence in the record, Prudential's decision to accept the opinions and conclusions of its experts without explanation is itself arbitrary and capricious. The

---

[168] <u>See also</u> <u>Glunt v. Life Ins. Co. of North America</u>, No. 11–3105, 2012 WL 205882, at *5 (E.D. Pa. Jan. 24, 2012)("LINA's decision to forego an independent medical examination of Glunt, given the subjective nature of her anxiety and its resulting limitations, further limited its ability to evaluate contrary medical evidence."); <u>Ricca v. Prudential Ins. Co. of Am.</u>, 747 F.Supp.2d 438, 445-46 (E.D. Pa.2010)("Prudential's election to forego an independent medical examination of plaintiff, given the subjective nature of her pain and limitations, should be reconsidered.")

[169] <u>See</u> Aetna 181-206.

[170] Aetna argues that it is not required to give special deference to the treating physicians' medical opinions, citing <u>Cerneskie v. Mellon Bank Long Term Disability Plan</u>, No. 04-1908, 142 Fed.Appx. 555 (3d Cir. May 10, 2005). It is true that Aetna does not have to automatically give special preference to the plaintiffs' own doctors. <u>Id.</u> at 558 (discussing under <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003)). However, "[p]lan administrators, … may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." <u>Black & Decker</u>, 538 U.S. at 834. Here, Aetna appears to have done just that.

evidence of plaintiff's subjective complaints of pain and physical limitations must be considered along with evidence that her complaints are groundless.").[171]

### e. Aetna's Denial of LTD Benefits Was an Abuse of Discretion

An administrator's decision is arbitrary and capricious "if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Miller v. American Airlines, Inc., 632 F.3d 837 (3d Cir. 2011)(quoting Abnathya v. Hoffmann–La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993))(quotations and citations omitted). Aetna's decision to deny the plaintiff benefits was unsupported by substantial evidence and was, thereby arbitrary and capricious. Aetna gave great weight to the opinions of its own experts and afforded little, to no, weight to the plaintiff's own physicians. Under the circumstances, the plaintiff's physicians—who had been treating him for several years— would be better able to recommend health and safety conditions than doctors who simply reviewed his medical files.

From reading the record, it is clear that Aetna's goal was to deny the plaintiff's claim. After calculating what LTD benefits the plaintiff would be entitled under the plan, Aetna noted that based on the plaintiff's restrictions/limitation to part-time work and his work history as a farmer and driver "there is potential for transferrable skills to alternate occupations [but] it is unlikely occupations will be identified to exist in the [labor market]

---

[171] See also Edgerton v. CNA Ins., Co., 215 F.Supp.2d 541, 551 (E.D. Pa. 2002)("Continental's selective acceptance of Dr. Browne's diagnosis, but rejection of his prognosis as to the practical, functional effects of that diagnosis, without providing a reason for doing so, impermissibly limits the scope of Dr. Browne's opinion that the plaintiff was disabled.").

as part time meeting part time RW of $31.78/hr."[172] Then, all actions and analysis taken

by Aetna after that point skewed towards negating those work restrictions.

The UPS LTD Plan was set up as part of a Collective Bargaining Agreement. The

Plan itself was very specific; the plaintiff had to both be able to work a "reasonable

occupation" based on his experience or, in the least, "may reasonably become, fitted by

education, training, or experience" *and* the occupation need to provide "an income of

more than 60% of your adjusted predisability earnings" in order to be reasonable.[173]

Aetna is charged with finding both of these factors before making a denial. After

reviewing the record, I cannot find that Aetna has offered substantial evidence to show it

complied with these terms of the Plan. See Metropolitan Life Ins. Co. v. Glenn, 554 U.S.

105, 118 (2008)("[T]he court furthermore observed that MetLife had emphasized a

certain medical report that favored a denial of benefits, had deemphasized certain other

reports that suggested a contrary conclusion, and had failed to provide its independent

vocational and medical experts with all of the relevant evidence. … All these serious

concerns, taken together with some degree of conflicting interests on MetLife's part, led

the court to set aside MetLife's discretionary decision. … We can find nothing improper

in the way in which the court conducted its review." (citations omitted)).

For these reasons, I will find judgment in favor of the plaintiff and against the

defendant on Count I.

---

[172] Aetna 132.

[173] Aetna 766. Aetna calculated the plaintiff's predisability salary as $54, 412.80 and found sixty percent of that salary to be $32,647.68, giving the plaintiff an adjusted CPI hourly of $15.89. Aetna 132.

## V.   Count II: Plaintiff's ERISA Section 502(c) Claim

The plaintiff's second claim alleges a violation of ERISA under 29 U.S.C. §
1132(c), also known as ERISA § 502(c). This section requires that a plan administrator
shall mail requested plan materials to a participant "within 30 days after such request."[174]
If an administrator fails to provide these materials within that time frame, the court in its
discretion may impose a $100 a day fine for non-compliance. 29 U.S.C. § 1132(c)(1).

The plaintiff claims that he requested "all relevant documents from Aetna
including plan documents relating to his claim for disability insurance benefits" on
September 10, 2012.[175] According to the complaint, the plaintiff had not received those
documents as of the filing of the complaint on October 16, 2012. Given that Aetna would
have 30 days to provide the information, Aetna would have been at least 6 days overdue
in providing this information. The plaintiff seeks the statutory penalties for not mailing
the requesting information during the statutory period.[176]

Neither party addresses Count II in their motion or response to the cross-motion.
At this point, it appears that the plaintiff is entitled to receive penalties for at least 6 days.

---

[174] Section 502(c) of ERISA, 29 U.S.C. § 1132(c), provides:

> Any administrator who fails or refuses to comply with a request for any information which such
> administrator is required by this subchapter to furnish to a participant or beneficiary (unless such
> failure or refusal results from matters reasonably beyond the control of the administrator) by
> mailing the material requested to the last known address of the requesting participant or
> beneficiary within 30 days after such request may in the court's discretion be personally liable to
> such participant or beneficiary in the amount of up to $100 a day from the date of such failure or
> refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c) (1985).

[175] Compl., Doc. 1 at 6.

[176] The plaintiff requests a penalty of $110 a day. I am not sure why he has chosen this number, since the statute
provides for $100 a day.

However, it is not clear when the plaintiff finally received the requested information.[177] Without more information, I cannot make a final judgment on this claim. The parties may submit motions on how this claim should be resolved.

## VI.    CONCLUSION

For the foregoing reasons, I will grant the plaintiff's motion for summary judgment and deny the defendant's motion. Judgment in favor of the plaintiff will be entered on Count I only.

An appropriate Order follows.

---

[177] In his March 1, 2012 appeal letter, the plaintiff requested that a copy of his file and plan documents be sent to his attorney and gave the attorney's address. Aetna 445. His attorney again requested this information March 21, 2012. Aetna 337, 445. According to the notes in Aetna's file, the plaintiff's attorney received this information. There is no note about the September request.